

**FILED**

APR 3 0 2019

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| KURTIS KILLSONTOP,<br><br>    Petitioner,<br><br>    vs.<br><br>LYNN GUYER,[1] ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>    Respondents. | Cause No. CV 17-111-M-DLC-JCL<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

On August 10, 2017, state pro se petitioner, Kurtis Killsontop, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254.[2] Killsontop was subsequently directed to show cause as to why his petition should not be dismissed for failure to exhaust/procedural default. See generally, (Doc. 3.) Killsontop timely responded. (Doc. 5.) Killsontop's pro se filings presented not only procedural issues and but also raised mental health concerns; out of an abundance of caution the Court directed counsel be appointed to represent Killsontop. (Doc.

---

[1] The Clerk of Court will be directed to amend the caption in this matter to reflect that Lynn Guyer is the current warden of the Montana State Prison. In a federal habeas petition, a state prisoner must name the state officer having custody of him as the respondent. *Ortiz-Sandoval v. Gomez*, 81 F. 3d 891, 894 (9th Cir. 1996) (citing Rule 2(a), 28 U.S.C. foll. §2254).

[2] Under the Prison Mailbox Rule, a habeas petition submitted by a pro se prisoner is deemed filed at the moment the prisoner delivers it to prison authorities for forwarding to the Clerk of Court. See, *Houston v. Lack*, 487 U.S. 266, 276 (1988).

7.) Counsel filed an Amended Petition on Killsontop's behalf. (Doc. 13.)

In his Amended Petition, Killsontop alleges trial counsel, Scott Spencer, provided ineffective assistance, by virtue of his lack of communication, which resulted in a failure to address Killsontop's competency to stand trial prior to Killsontop testifying in his own defense. Killsontop asserts this failure constituted a substantive due process violation. (Doc. 13 at 12-18.) Killsontop acknowledged that his petition might be procedurally defaulted, but asserted the narrow exception set forth in *Martinez v. Ryan*, 566 U.S. 1 (2012), provided an avenue to excuse the potential default. Specifically, Killsontop asserted he could establish his ineffective assistance of counsel claim was "substantial." See, (Doc. 13 at 12, 17-18.)

The State was directed to respond to the Amended Petition, (Doc. 15), and timely filed its Answer. (Doc. 21.) In response, the State asserted that Killsontop had failed to exhaust his ineffective assistance of trial counsel claim and that the claim was, in fact, procedurally defaulted. *Id.* at 40-58. Contrary to Killsontop's assertion, the State argued the rule of *Martinez* could not serve to excuse the procedural default because the underlying ineffective assistance of counsel claim was not "substantial." *Id.* at 42-58.

For the reasons discussed herein, Killsontop's petition should be dismissed as procedurally defaulted.

I.      **Procedural History**

i.      **Trial Court proceedings**

On New Year's Eve 2013, Killsontop and five others celebrated by drinking

liquor at his trailer.  As the night unfolded an altercation ensued and two

individuals in attendance, Regina Matt and Monte Swanson, were stabbed.

Killsontop was ultimately arrested and charged with two counts of Assault with a

Weapon in Montana's Fourth Judicial District Court.  See e.g., (Doc. 21-1.)

Scott Spencer, from the Office of the State Public Defender, was appointed

to represent Killsontop.  On March 27-28, 2014, a jury trial was held.  See

generally,  Trial Trns. (Doc. 21-3.)  It is undisputed that all in attendance at the

New Year's Eve gathering at Killsontop's trailer were intoxicated.[3]  Matt and

Swanson both testified at the trial, (id. at 190-206; 206-221), as did Jake Gillis,

another individual who was present for the events at Killsontop's trailer.  Id. at

249-263.

Although she admitted to providing differing accounts of what had occurred

to law enforcement officers, Matt testified at trial that Killsontop stabbed her.  Id.

at 197: 20-23.[4]  Swanson stated he did not see Killsontop assault Matt, but there

---

[3] See e.g.,  (Doc. 21-3 at 199) (Matt testifies right after being stabbed she "passed out" or "blacked out"); id. at 201 (Matt testified Killsontop was "pretty drunk"); id. at  216 (Swanson acknowledges he himself had a "significant amount to drink"); id. at 254: 3-4 (Gillis informed law enforcement responding to scene that it had "started out with a party and everybody started getting intoxicated."), id. at 291 (Killsontop testified that at the time he was interviewed by law enforcement following the incident he was still under the influence from the liquor.).
[4] Q:      Do you know who stabbed you:
   A:      Kurtis.

3

was no doubt in his mind that Killsontop was responsible for stabbing him and that the assault was unprovoked. *Id.* at 215:14-18; see also, *id.* at 212-13. Gillis testified: "

> Killsontop came out with a knife and, you know, went after [Matt's] friend [Swanson], first. And [Matt] had pulled him off and she—he went after [Matt]. [Matt] got stabbed and she ran out the door.

*Id.* at 255: 15-18.

Killsontop testified in his own defense. *Id.* at 264-292. Killsontop denied stabbing Swanson but acknowledged that he and Matt got into a wrestling match when he tried to take a knife away from her. *Id.* at 272-73. Killsontop acknowledged Matt could have been punctured with the knife when they fell to the ground. *Id.* at 273: 11-13. At the conclusion of trial, the jury found Killsontop guilty of both counts. *Id.* at 344.

During his continued incarceration following the trial and before sentencing, Killsontop's mental health began deteriorating. On May 16, 2014, an incident report was filed. (Doc. 21-6.) At some point prior, Killsontop had stopped taking his medication. He was urinating and defecating in his cell and appeared to be eating feces and smearing it around his cell. The following day, the situation caused further alarm and a decision was made to transport Killsontop for an evaluation. *Id.* Killsontop was not compliant with officers' requests; OC spray

---

Q:   Any doubt about that?
A:   No.

was deployed in order remove Killsontop from his cell. *Id*. Killsontop was transported for the evaluation. *Id*.

On May 22, 2014, a hearing was held on the State's petition to involuntarily commit Killsontop to the Montana State Hospital (MSH). See, (Doc. 21-7 at 1); see also, (Doc. 12.) During that hearing, the district court noted Killsontop had an active criminal matter pending and took a recess. Following the break, the attorneys involved in Killsontop's criminal case were apparently summoned to the civil hearing to provide their opinions relative to Killsontop's potential commitment and the interplay with his criminal case and upcoming sentencing hearing. See, (Doc. 12 at 21-26.)

Ultimately, it was determined that Killsontop would be civilly committed to MSH for treatment. *Id*. at 30. Relative to the criminal case, the court ordered personnel at MSH also evaluate Killsontop for his fitness to proceed and to render an opinion "regarding the diagnosis of the mental condition of [Killsontop] as to whether he suffers from a mental disorder which may require commitment, or whether he is seriously mentally disabled, or if they issue a report on whether, if he is suffering from mental disease or defect, whether he has the capacity to understand the proceedings and assist in his own defense." *Id*. An order was issued to that effect. See, (Doc. 21-7.)

On June 24, 2014, Killsontop was transferred from the MSH/A-Wing (Civil

Unit) to the MSH/D-Wing (Forensic Unit).  (Doc. 22 at 1.)  Killsontop had been

admitted to MSH on six prior occasions.  Apparently in 2008, Killsontop was

diagnosed with Schizophrenia and, according to Killsontop, his prior admissions

resulted from his "trying to figure out what Schizophrenia is." *Id.* at 5.   It was

confirmed that following his jury trial, Killsontop stopped taking his medication

and became "floridly psychotic." *Id.* at 5.  Killsontop explained that after his trial,

the Missoula County Detention Center changed his medications and failed to

provide him what had previously been prescribed. *Id.* at 6.  As a result, Killsontop

began "hearing voices, plugging his toilet, and 'was planning to fight them.'" *Id.*

Upon re-instating his usual antipsychotic medication regime, Killsontop's auditory

hallucinations disappeared. *Id.*

Killsontop was diagnosed not only with Schizophrenia (multiple episodes,

currently in partial remission), but also with: Cannabis Use Disorder, severe;

Alcohol Use Disorder, moderate; Borderline Intellectual Functioning; and,

Antisocial Personality Disorder. *Id.*  The MSH professionals concluded that

because his psychotic symptoms had been stabilized, he was found to be fit to

proceed with his sentencing. *Id.* at 7.  Further, it was opined that Killsontop had

the capacity at that time to assist legal counsel in his post-trial defense. *Id.* "He

will likely be a difficult client to represent due to personality variables, but as long

as he continues with his current medication program and refrains from substance

abuse, he is considered able to understand the proceedings against him and assist his attorney in his defense." *Id.*

On September 19, 2014, Mr. Killsontop appeared before the state district court for imposition of sentence. The State supported the recommendation made in Killsontop's Presentence Investigation Report (PSI) of 10 years in prison on each count, to run consecutively, for a total sentence of 20-years in the Montana State Prison with no time suspended. (Doc. 21-11 at 5); see also, (Doc. 22-2 at 7.) The defense recommended a fully suspended sentence. *Id.* at 13. The district court imposed a sentence of 10 years at the Montana State Prison, with credit for 263 days of time served, on Count I, and a consecutive 10-year sentence on Count II with all-time suspended. *Id.* at 18-19; see also, Judg. (Doc. 21-12 at 2.)

### ii.    Post-sentencing/Appellate Proceedings

As set forth below, Killsontop did not attempt to raise a claim surrounding his competency to stand trial during any of his post-sentencing proceedings. Likewise, he did not appeal any of his postconviction matters to the Montana Supreme Court, nor did he file a petition for a writ of habeas corpus with the Montana Supreme Court. Thus, the Montana Supreme Court has never considered the merits of Killsontop's claim.

### a. Direct Appeal

7

Killsontop timely filed a direct appeal. There, he raised a single claim arguing the trial court erred by admitting an officer's testimony regarding Regina Matt's prior consistent statements. See generally, (Doc. 21-13.) In a non-cite order affirming Killsontop's convictions, the Montana Supreme Court determined the admission of the testimony constituted trial error, but that the error was harmless. *State v. Killsontop*, 2016 MT 235N, 385 Mont. 542, 381 P. 3d 549 (Table).

### b. Post-Conviction I

Killsontop then sought postconviction relief in the state district court. There, he argued trial counsel provided ineffective assistance by failing to introduce into evidence a written statement of his account of what transpired on December 31, 2013. See, (Doc. 21-16.) The state district court dismissed Killsontop's petition finding that because Killsontop testified on his own behalf, he was able to tell his side of the story and it would have been improper for trial counsel to use the written statement in effort to bolster his testimony. (Doc. 21-17 at 2.) The court also found the claim was precluded because Killsontop could have raised it on direct appeal. *Id.*

### c. Post-Conviction II

In February of 2017, Killsontop sent a letter to the state district court addressed "to whom it may concern," wherein he apparently: expressed his

disagreement with testimony presented by various trial witnesses, explained his interpretation of several trial exhibits, and requested that counsel be appointed to assist him. The state district court treated the letter as a petition for postconviction relief and denied and dismissed the petition. See, (Doc. 21-18.) The district court noted Killsontop was able to address the bulk of his concerns via the cross-examination of the State's witnesses and with his own trial testimony. Moreover, because the issues were record based and could have been raised on direct appeal, Killsontop was barred from postconviction relief. *Id.* at 3-4.

### d. Post-Conviction III/state district court habeas petition

Killsontop next sought relief contending trial counsel, Spencer, was ineffective for: failing to let Killsontop call his witnesses to the stand; misleading Killsontop by not showing him pictures that were used at trial; providing incorrect information; and, advising Killsontop he was not able to obtain a different attorney. Killsontop also restated his general disagreement with the testimony presented by the State's witnesses. See, (Doc. 21-19 at 2-3.)

The state district court found Killsontop's third attempt at relief to be procedurally barred, because the claims were known to Killsontop and could have been raised in his original petition. Additionally, the district court found the filing, on its face, to be procedurally deficient under Montana law. (Doc. 21-20 at 3-5.)

### II.   Killsontop's Claims

Killsontop alleges his trial counsel, Scott Spencer, provided ineffective assistance, by virtue of his lack of communication, and failed to address Killsontop's competency to stand trial prior to Killsontop testifying in his own defense. Killsontop asserts this failure constituted a substantive due process violation. (Doc. 13 at 12.)

### III.   Analysis

A habeas petitioner must exhaust his or her remedies in the state courts before a federal court can grant relief on constitutional claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To do so, the petitioner must invoke one complete round of the state's established appellate review process, fairly presenting all constitutional claims to the state courts so that they have a full and fair opportunity to correct alleged constitutional errors at each level of appellate review. *Id.* at 845. When a habeas petitioner has not fairly presented a constitutional claim to the highest state court, and it is clear that the state court would now refuse to consider it because of the state's procedural rules, the claim is said to be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

As explained above, Killsontop's claim is procedurally defaulted. Federal review of a procedurally defaulted claim is barred unless the habeas petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### i.   *Martinez v. Ryan* and Procedural Default

The absence or ineffective assistance of state post-conviction counsel generally cannot establish cause to excuse a procedural default because there is no constitutional right to counsel in state postconviction proceedings. *Id.* at 752-54. *Martinez v. Ryan*, 566 U.S. 1 (2012), however, established a limited equitable exception to this general rule, that only applies to Sixth Amendment ineffective assistance of trial counsel claims. *Martinez* held that inadequate assistance of postconviction counsel or lack of counsel at initial collateral proceedings "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 14.

In *Trevino v. Thaler*, the Supreme Court described the four-prong *Martinez* analysis as requiring a petitioner to show the following: (1) that his ineffective assistance claim of trial counsel claim is "substantial;" (2) that he had no counsel or ineffective counsel during the state collateral review proceeding; (3) that the state collateral review proceeding was the "initial" review proceeding where the ineffective assistance of trial counsel claim could be raised; and (4) that state law requires ineffective assistance of trial counsel claims to be raised in initial-review

collateral proceedings. 569 U.S. 413, 423 (2013); see also, *Martinez*, 566 U.S. at 13-17.

In the present case, the Court is not concerned with the third and fourth prongs and has previously held in other cases that because defendants are generally precluded from raising ineffective assistance claims requiring development of the record on direct appeal, by design Montana law requires those claims to be raised in postconviction proceedings.[5] Additionally, as set forth above, Killsontop did not have counsel during his postconviction proceedings; the second prong is also met. Thus, at issue in the present case, as the parties have identified, is the first prong. For the *Martinez* exception to apply, Killsontop must establish that the underlying claim of ineffective assistance is substantial. To show his claim is "substantial" Killsontop must demonstrate it "has some merit." *Martinez*, 566 U.S. at 14 (comparing the standard to those for certificates of appealability from *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).[6] Or to put it another way, a claim is "*in*substantial" if it "does not have any merit or . . . is wholly without factual support." *Id.* at 16.

Determining whether an IAC claim is substantial requires a federal court to examine the claim under *Strickland v. Washington*, 466 U.S. 668 (1984). The

---

[5] See e.g., *Miller v. Kirkegard*, CV-13-13-GF-DWM, Or. re: *Martinez* at 25-26 (D. Mont. May 20, 2015).

[6] The standard for issuing a certificate of appealability requires a petitioner to show: "reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different matter or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336.

*Strickland* standard requires a showing of both deficient performance and prejudice. 466 U.S. at 687. To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness...under prevailing professional norms." *Id.* at 688. To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

But because Killsontop was not represented by counsel during his postconviction proceedings, the showing he needs to make is different than if he had been represented by counsel. The Ninth Circuit recently explained:

> Because *Martinez* requires a showing that post-conviction counsel was ineffective under the standards of *Strickland*, a petitioner who was represented by postconviction counsel in his initial-review collateral proceeding must show not only that his procedurally defaulted trial-level IAC claim is substantial but also that there is "a reasonable probability that the trial-level IAC claim would have succeeded had it been raised" by postconviction counsel. However, a petitioner who was not represented by post-conviction counsel in his initial-review collateral proceeding is not required to make any additional showing of prejudice over and above the requirement of showing a substantial trial-level IAC claim.

*Rodney v. Filson*, 916 F. 3d 1254, 1260 (9th Cir. 2019) (quoting *Trevino*, 569 U.S. at 423.).

The question whether an IAC claim is substantial under *Martinez* is not the

same as a merits review; rather, it is more akin to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue. See *Martinez*, 132 S. Ct. at 1318-19. "Thus, to determine whether a claim is substantial, *Martinez* requires this Court to *review* but not *determine* whether trial counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice, and to *determine* only whether resolution of the merits of the IAC claim would be debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them." *Northrup v. Blades*, Case No. 1:14-cv-00371-CWD, 2015 WL 5273261, at *7 (D. Idaho Sept. 9, 2015)(emphasis in original).

As explained in greater detail below, because a review of Killsontop's claim does not show Spencer performed deficiently or a reasonable probability of prejudice, the Court does not believe the issue is debatable or presents a reason to encourage further pursuit. Accordingly, Killsontop's claim is insubstantial under *Martinez* and is procedurally defaulted without excuse.

### ii. Killsontop's claim is not substantial

"A criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993). "[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual

understanding of the proceedings against him.'" *Id.*, quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). "Counsel's failure to move for a competency hearing violates the defendant's right to effective assistance of counsel when 'there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered.'" *Stanley v. Cullen*, 633 F. 3d 852, 862 (9th Cir. 2011)(citations omitted).

As a preliminary matter, although Killsontop took issue with Spencer's representation, at no point in his various postconviction proceedings did Killsontop express a belief that he was not competent to stand trial or that during the time-period surrounding trial he had been denied and/or had stopped taking his medication. Rather, Killsontop argued Spencer was ineffective for failing to introduce his written statement into evidence (*Post-Conviction I*); contended he generally disagreed with witness testimony and exhibits presented during trial (*Post-Conviction II*); and, claimed Spencer was ineffective for: failing to call witnesses, not showing Killsontop certain exhibits prior to trial, and providing incorrect information (*Post-Conviction III*). All of the postconviction claims advanced by Killsontop demonstrate not that he lacked the ability or understanding to consult with Spencer, *Dusky*, 362 U.S. at 402, but rather that he disagreed with

15

Spencer's trail strategy.

Moreover, the fact of Killsontop's schizophrenia diagnosis does not, on its own, equate to incompetence. A defendant suffering from mental illness may still be able to understand the proceedings against him and assist in his own defense. See, *United States v. Garza*, 751 F. 3d 1130, 1135-36 (9th Cir. 2014) (stressing need for clear connection between mental illness, even if severe, and "some failure by the defendant to understand to proceedings or assist in his own defense"); *Boyde v. Brown*, 404 F. 3d 1159, 1166 (9th Cir. 2005)(inmate's "major depression" and "paranoid delusions" did not raise a doubt regarding his competence to stand trial.)

Moreover, Spencer was aware of Killsontop's diagnosis prior to trial. As Spencer explained during the May 22, 2014, hearing:

> The fact that he was schizophrenic or has a diagnosis of schizophrenia had been an issue and was known at the time of me representing him, and it was known at the time of the incident he was living on his own, seeing a case manager, and there was no indication of problems.

(Doc. 12 at 21-22.) Spencer apparently made a pre-trial determination that there was not an adequate basis to present evidence at trial that Killsontop suffered from a mental disease or disorder that made him unable to have had the requisite state of mind at the time the assaults. See, Montana Code Annotated, §46-14-102; see also, *State v. Korell*, 213 Mont. 316, 322, 690 P. 2d 992, 996 (1984). Thus, while Spencer was aware of Killsontop was schizophrenic, it was his apparent belief that

Killsontop's mental health was being managed appropriately and that he was competent to stand trial.  Spencer "was in the best position to evaluate [Killsontop's] competence and ability to render assistance." *Torres v. Prunty*, 223 F. 3d 1103, 1109 (9th Cir. 2000)(citing *Medina v. California*, 505 U.S. 437, 440 (1992)).

In addition to Spencer, neither the prosecution nor the district court raised a concern regarding Killsontop's competency to stand trial. See, *Hernandez v. Ylst*, 930 F. 2d 714, 718 (9th Cir. 1991) ("We deem significant the fact that the trial judge, government counsel, and Hernandez's own attorney did not perceive a reasonable cause to believe Hernandez was incompetent."). The issue did not arise until months after the jury rendered its verdict.

Moreover, there is no indication from the state court record that would indicate Killsontop exhibited bizarre or irrational behavior during his trial or pretrial proceedings.  See, *Drope v. Missouri*, 420 U.S. 162, 180 (1975) (a defendant's irrational behavior is a factor to consider when evaluating competence).  Likewise, Killsontop has presented no evidence from the state court record that indicates he lacked understanding of the proceedings or was unable to assist in his own defense. "Although no particular facts signal a defendant's incompetence, suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and available medical evaluations

17

of the defendant's competence to stand trial. *Williams v. Woodford*, 384 F. 3d 567, 604 (9th Cir. 2004).

The fact that the parties did not perceive a reasonable basis to question Killsontop's competency during trial was further underscored by their impressions set forth during the May 22, 2014 hearing. Although the question of Killsontop's competence was not previously on the radar, once the parties were made aware of the issues that had arisen at the Missoula County Detention Center, all involved began making relevant considerations.

Spencer explained that, in light of Killsontop's decompensation he had:

> started to work on thinking about getting an independent evaluation through [the Office of the Public Defender], which would be geared more toward whether [Killsontop] could appreciate the criminality and conform his actions to the law which would, as a sentencing option, give the Court the option to do a [Department of Health and Human Services] commit rather than a [Montana State Prison] commit, understanding that the [Department of Health and Human Services] can still end up sending him to prison if he couldn't be treated.

(Doc. 12 at 22: 14-22.)[7]   While Shaun Donovan, the prosecuting attorney, remained somewhat skeptical, he acquiesced to further intervention of mental health professionals on Killsontop's behalf, commenting:

---

[7] At the dispositional stage following the trial and conviction, a defendant may present evidence that he was unable to appreciate the criminality of his conduct or to conform his conduct to the law due to a mental disease or disorder. M.C.A. Section 46-14-311. After making this determination, the court is required to sentence a defendant to be committed to the custody of the department of public health and human services to be placed in an appropriate correctional facility, mental health facility, residential facility or developmental disabilities facility for custody, care, and treatment for a definite period of time. M.C.A. Section 46-14-312.

I do think from my perspective, because of the lack of [the mental disease] issue being raised previously and some other things, I am skeptical about the genuineness of the symptoms that the defendant is putting forth, and hold open at least the possibility this is all contrived in an effort to improve his sentencing situation. But I think the best chance of determining whether that's true of whether that's not true is someplace like the State hospital.

(Doc. 12 at 25: 3-11.)

As set forth above, the trial court ordered the MSH commitment and evaluation, and was particularly interested in whether or not Killsontop had "acquired some mental disease since he committed the crime and was convicted." *Id.* at 31: 21-24. While the court was not convinced that Killsontop lacked the requisite intent to commit the underlying assaults, see e.g., *id.* at 30-31, the door was left open to considering whether or not Killsontop could appreciate the criminality of his conduct or conform his conduct to the requirements, pending review of the MSH evaluation. *Id.* at 32: 9-13.

As set forth above, the evaluation concluded that, following the stabilization of his psychotic symptoms, Killsontop was able to understand the proceedings against him and assist his attorney in his defense. (Doc. 22 at 7.) The evaluation noted, "[a]lthough his account of the incident which resulted in his conviction of two counts of Felony Assault with a Weapon is different from the official version, it is our opinion that he possesses a factual as well as rational understanding of the charges of which he has been convicted. *Id.* Further, Killsontop advised

19

evaluators that his "mental illness symptoms 'didn't really have anything to do with the crime.'" *Id.* at 5. And perhaps most importantly, Killsontop's own report to MSH evaluators supported the parties' belief that he was competent at the time of trial; his difficulties began "[a]fter his trial" when "the jail changed his medications and wouldn't give him his prescribed medications." *Id.* at 6.

Because there was no basis to believe that Killsontop was incompetent at the time of trial, there was no corresponding basis upon which Spencer could have challenged Killsontop's competency. Spencer's choice not to raise a competency challenge was objectively reasonable and there is not a reasonable probability Killsontop's proceedings would have been different had Spencer made such a challenge. See, *Strickland*, 466 U.S. at 688. Further, for purposes of considering whether this claim is substantial under *Martinez*, reasonable jurists could not debate the resolution of Killsontop's IAC claim or find that the issue deserves encouragement to proceed further. *See Martinez*, 132 S. Ct. at 1318-19, *Miller-El*, 537 U.S. at 336.

## IV.   Conclusion

Killsontop has failed to establish that his claim is substantial under the framework provided by Martinez and its progeny. Accordingly, the petition is procedurally defaulted without excuse and should be dismissed with prejudice.

## V.   Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, 565 U.S. 134,  140-141(2012) (quoting *Slack*, 529 U.S. at 484).

As explained herein, the Court utilized the COA standard in determining that Killsontop failed to establish his claim "substantial" for purposes of the *Martinez* analysis.  Killsontop did not make this showing.  Further, because Killsontop has not established a basis to set aside his procedural default, reasonable jurists would find no basis to encourage further proceedings.  Additionally, in considering the *Strickland* as it applied to the claim, it does not appear that Killsontop established he was deprived of a constitutional right.  There are no close questions and there is

no reason to encourage further proceedings.  A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## ORDER

The Clerk of Court is directed to amend the caption in this matter to reflect Lynn Guyer as the current warden of the Montana State Prison.

## RECOMMENDATION

1. The Amended Petition (Doc. 13) should be DISMISSED WITH PREJUDICE as procedurally defaulted.

2.  The Clerk of Court should be directed to enter, by separate document, a judgment of dismissal.

5. A certificate of appealability should be DENIED.

Mr. Killsontop may object to this Findings and Recommendation within 14 days. 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

DATED this 30th day of April, 2019.

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge